## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

|  |  |  |
|---|---|---|
| INDEPENDENT PARTY OF FLORIDA and PARTY FOR SOCIALISM AND LIBERATION, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. <u>4:20-cv-00110-MW-CAS</u> |
| LAUREL M. LEE, Florida Secretary of State, in her official capacity, | ) ) ) ) | |
| Defendant. | ) ) ) | |

## MOTION FOR PRELIMINARY INJUNCTION

COMES NOW Plaintiffs The Independent Party of Florida ("Independent Party") and The Party for Socialism and Liberation ("Party for Socialism"), by and through their attorney of record, Daniel J. Treuden, to respectfully move this Court for a preliminary injunction barring the application of Fla. Stat. § 103.021(4) to keep their respective Presidential and Vice Presidential candidates off the November 2020 general election ballot. This motion is filed pursuant to N.D. Fla. Loc. R. 5.1 and 7.1.

1

## Conference Certificate

Pursuant to N.D. Fla. Loc. R. 7.1(C), the undersigned counsel

sought the position of counsel for the Defendant Laurel M. Lee ("Lee"),

but did not hear back before filing this motion.

## Standard of Review

Preliminary injunction:

> is appropriate if – but only if – the movant shows "(1)
> substantial likelihood of success on the merits; (2)
> irreparable injury will be suffered unless the injunction
> issues; (3) the threatened injury to the movant outweighs
> whatever damages the proposed injunction may cause the
> opposing party; and (4) if issued, the injunction would not be
> adverse to the public interest."

*Callahan v. United States Dept. of Health and Human Services*, 939

F.3d 1251, 1257 (11th Cir. 2019) (quoting *McDonald's Corp. v.

Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998)).

In turn, regarding the merits of this constitutional challenge to

Florida's ballot access law, the court primarily follows the standard set

out in *Anderson v. Celebrezze*, 460 U.S. 780 (1983):

> [A] reviewing court must first "consider the character and
> magnitude of the asserted injury to the rights protected by
> the First and Fourteenth Amendment[s]." [*Anderson*, 460
> U.S. at 789.] Then the court must "identify and evaluate the
> precise interests put forward by the State as justifications
> for the burden imposed by its rule." *Id*. Finally, the court

> must "determine the legitimacy and strength of each of those interests," while also considering "the extent to which those interests make it necessary to burden the Plaintiff's rights." *Id.*
>
> Further, if the state election scheme imposes "severe burdens" on the plaintiffs' constitutional rights, it may survive only if it is "narrowly tailored and advance[s] a compelling state interest." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 . . . (1997). But when a state's election law imposes only "reasonable, nondiscriminatory restrictions" upon a plaintiff's First and Fourteenth Amendment rights, "a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." *Id.* (quotations omitted). In short, the level of the scrutiny to which election laws are subject varies with the burden they impose on constitutionally protected rights – "Lesser burdens trigger less exacting review." *Id.*

*Stein v. Alabama Secretary of State*, 774 F.3d 689, 694 (11th Cir. 2014).

In turn, given that this case involves a ballot access question in a presidential election, Florida has a diminished interest in regulating this election: "[W]e recognized that 'the State has a less important interest in regulating Presidential elections than statewide or local elections, because the outcome of the former will be largely determined by voters beyond the State's boundaries.'" *Id.* at 691 (quoting *Anderson*, 460 U.S. at 795).

3

**Time Table for Motion – Need for Preliminary Injunction**

The deadline for minor parties to certify their candidates for November's presidential election ballot to the Secretary of State is September 1, 2020. It is unlikely that judgment in this case will be entered before that date considering the life of a typical civil case. Therefore, the Plaintiff's file this motion for preliminary injunction to avoid a deprivation of their rights in the 2020 presidential election cycle. There is sufficient time for the parties to fully brief this motion and the court to consider it without having to expedite this matter.

**Relevant Facts**

*History of Minor Political Party Ballot Access Statutes in Florida*

For approximately fifty years from approximately 1949 to 1999, Florida provided ballot access for presidential candidates for minor political parties based solely on ballot access petitions. (Decl. of Richard Winger, ¶¶ 4-9) ("Winger Decl."). In 1998, Florida amended its state constitution which held that all candidates should be treated equally. *Id.*, ¶ 9. The legislature passed SB 754 in 1999 wherein minor political parties could become a "qualified party" if it filed a list of officers, a copy of its bylaws, and agreed to report information about its finances. *Id.*

Once qualified, a minor political party could affiliate with a "national" political party that held a national presidential convention, it could then place its presidential nominee on the ballot. *Id*. The 2000 election was the first time since before 1949 that a minor political party could nominate its candidates without circulating nomination petitions.[1]

The sky did not fall and voters were not befuddled over the number of choices on the ballot. Minor political parties freely placed presidential candidates on the ballot for the following parties: Green, Reform, Libertarian, Natural Law, Workers World, Constitution, Socialist, and Socialist Workers. *Id*. With the two major political party candidates, voters had to navigate a list that included a mere ten partisan candidates.

In 2004, six minor political parties nominated presidential candidates to the ballot: Constitution, Green, Libertarian, Reform, Socialist, and Socialist Workers. *See*

https://uselectionatlas.org/RESULTS/state.php?year=2004&fips=12&f=

---

[1] For parties that were not considered "national" parties, or if they were not affiliated with a party that held a national convention, the path to the ballot was achieved by submitting nomination petition with signatures at least equal to 1% of registered voters in the state.

0&off=0&elect=0&minper=0 (last accessed April 6, 2020). In 2008,

eleven minor political parties nominated their candidates by

certification: America's Independent, Boston Tea, Constitution, Ecology,

Green, Libertarian, Objectivist, Prohibition, Socialism and Liberation,

Socialist, and Socialist Workers. *See*

https://uselectionatlas.org/RESULTS/state.php?year=2008&fips=12&f=

0&off=0&elect=0&minper=0 (last accessed April 6, 2020). The partisan

candidate list voters had to consider was eight and thirteen in 2004 and

2008 respectively.

   In 2011, the legislature passed a new law which changed the

definition of a "national" party to one that is "registered with and

recognized as a qualified national committee of a political party by the

Federal Election Commission." (Winger Decl., ¶ 12.) This definition is

the current definition at issue in this case. Fla. Stat. § 103.021(4)(a).

This change severely limited the number of minor political parties that

qualified to nominate their candidates by certification to the state's

presidential election ballot. The previous definition defined a national

party as a party that was previously on the ballot in two states, a

threshold that would typically be met by every party that also holds a

national convention. Fla Stat. § 103.021(4)(a) (2010 version) ("In this section, the term 'national party' means a political party established and admitted to the ballot in at least one state other than Florida.")

In 2011, counsel for the American Elect's party received a letter from the Florida Secretary of State advising the party that the new definition of "national party" would not be enforced and all minor parties acted accordingly. (Winger Decl., ¶ 13.) A copy of the letter addressed to the Americans Elect Party is submitted as Exhibit A. *Id.*

Although the Americans Elect Party ultimately decided not to run a candidate in 2012, this letter provided the basis for five minor political parties to nominate candidates by certification even though they were not FEC-recognized: American Independent, Justice, Objectivist, Peace & Freedom, and Socialism and Liberation. (Winger Decl., ¶ 13.) The FEC-recognized minor parties that certified candidates for the presidential ballot in Florida totaled four: Constitution, Green, Libertarian, and Socialist. With the two major political parties, that put the presidential ballot at eleven partisan candidates. *See* https://uselectionatlas.org/RESULTS/state.php?year=2012&fips=12&f=0&off=0&elect=0&minper=0 (last accessed on April 6, 2020).

In summary, the four presidential elections from 2000 through 2012 featured minor political party ballot access by mere certification, including most particularly, 2012 wherein *all* minor political parties were granted access to the ballot by certification of the party chairman. The total partisan candidates on the presidential ballot ranged from eight to thirteen candidates. Although the state says they need a 1% signature threshold to protect against a confusing ballot, the number of candidates based on actual experience are not so numerous to make a typical voter confused or make it difficult for them to locate their candidate of choice.

*The 2016 Election Cycle – Plaintiffs' Attempts to Nominate*

In 2016, both Plaintiffs in this case attempted to nominate candidates for office. (Decl. of Ernest Bach, ¶ 4 and Ex. B) ("Bach Decl."); (Decl. of Bryan Ellis, ¶ 4) ("Ellis Decl."). Both received similar letters to the one set forth as Exhibit B that stated the Secretary of State would not be including their candidates on the presidential ballot for the 2016 election. (Bach Decl., ¶ 5; Ellis Decl., ¶ 5.) In both cases, this advisement occurred too close to the election for either party to seek judicial relief from the Secretary of State's decision. (Bach Decl., ¶

6; Ellis Decl., ¶ 6.) This action violated the Plaintiffs' First and Fourteenth Amendment rights to association, speech, political activity, equal protection, and their respective members' voting rights. Furthermore, because the Secretary of State barred the Plaintiffs' presidential candidates from appearing on the 2016 presidential ballot, they fully expect the Secretary of State to bar them from certifying their candidates for the 2020 presidential ballot as other minor political parties are allowed to do, all in violation of the First and Fourteenth Amendments.

## Argument

The requirement that a minor political parties be affiliated with a national party recognized by the Federal Election Commission as a "national committee" before they can nominate their candidates by certification rather than by petition circulation is not narrowly tailored to further a legitimate state interest, even under the sliding scale standard approved by *Anderson v. Celebrezze*, 460 U.S. 780 (1983) and violates the equal protection clause. Furthermore, the requirement that a minor political party submit a petition signed by one percent of the registered voters is an unconstitutional hindrance to the ballot under

the recent Georgia case that struck down a similar one-percent signature requirement statute: *Green Party of Georgia v. Kemp*, 171 F.Supp.3d 1340 (N.D. Ga. 2016) (aff'd on appeal in *Green Party of Georgia v. Kemp*, 674 Fed. Appx. 974, 2017 U.S. App. LEXIS 1769, 2017 WL 429257).[2]

These restrictions will severely injure the Plaintiffs and the Plaintiffs' members First and Fourteenth Amendment rights and this injury will be irreparable if their candidates are not on the 2020 general election ballot. The potential injury to the State of Florida if the State cannot enforce the status quo is also substantially outweighed by the injury to be suffered by the Plaintiffs and Plaintiffs' members if their candidate is barred from the ballot. Finally, the action would not violate the public interest if the preliminary injunction is granted.

## I.  Several Constitutional Rights are Violated by Florida's Substantial Burdens to Ballot Access.

The right to vote, the right to associate for political purposes, the right of voters to cast votes effectively, and the right to be a political

---

[2]  The Eleventh Circuit issued the following opinion: "Judgment of the district court is affirmed based on the district court's well-reasoned opinion. *See Green Party of Ga. v. Kemp*, 171 F.Supp.3d 1340 (N.D. Ga. 2016).

candidate are fundamental constitutional rights protected by the First and Fourteenth Amendments. *Burdick v. Takushi*, 504 U.S. 428, 433 (1992); *Eu v. San Francisco County Democratic Central Committee*, 489 U.S. 214, 224 (1989); *Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 214 (1986); and *Anderson*, 460 U.S. at 787.

First Amendment rights are implicated whenever a state action imposes a barrier to the free exercise of the voting franchise or any First Amendment Right. That barrier does not have to wholly prevent voters from exercising a First Amendment right to be found unconstitutional. And "'that right is burdened when the state makes it more difficult for these voters to cast ballots.'" *Molinari v. Bloomberg*, 564 F.3d 587, 604 (2nd Cir. 2009) (quoting *Price v. New York State Bd. of Elections*, 540 F.3d 101, 108 (2nd Cir. 2008)) . The First Amendment creates an open marketplace where ideas, most especially political ideas, may compete without government interference. It does not call on federal courts to manage the market by preventing too many buyers from settling on a single product." *New York State Bd. of Elections v. Lopez Torres*, 552 U.S. 196, 208 (2008) (internal citations omitted). "[T]he First Amendment 'has its fullest and most urgent application' to speech

uttered during a campaign for political office." *Eu*, 489 U.S. at 223

(quoting *Monitor Patriot Co. v. Roy*, 401 U.S. 886, 913 (1971)). Thus,

any limits on speech in the context of a political campaign is subject to

strict scrutiny. *Citizens United v. Federal Election Commission*, 558

U.S. 310, 340 (2010).

In ballot access cases, the First Amendment right of free association

is found in three associational relationships: (1) the right of voters to

associate through the organization of a political party; (2) the rights of

an organized political party to control the determination of those

candidates with which it associates; and (3) the rights of an organized

political party to control its nominations by controlling who may

participate in such nominations. *Democratic Party of the United States*

*v. Wisconsin ex rel. La Follette*, 450 U.S. 107, 121-122 (1981).

The implications of the Equal Protection Clause on the

constitutionality of ballot access statutes generally focuses on (a) the

disparate treatment of major and minor parties, and (b) the disparate

treatment of the candidates of parties and independent candidates. *See*

*Anderson*, 460 U.S. at 793-94:

> A burden that falls unequally on new or small political
> parties or on independent candidates impinges, by its very

> nature, on associational choices protected by the First
> Amendment. It discriminates against those candidates and –
> of particular importance – against those voters whose
> political preference lie outside the existing political parties. .
> . . By limiting the opportunities of independent-minded
> voters to associate in the electoral arena to enhance their
> political effectiveness as a group, such restrictions threaten
> to reduce diversity and competition in the marketplace of
> ideas.

*Anderson*, 460 U.S. at 793-94 (internal citations omitted).

Here, in this Florida construct, there are two statutes that limit access to the ballot. First, the Plaintiffs are barred from the ballot if they are not associated with a party that is nationally recognized by the Federal Election Commission ("FEC") as a national committee even though there is no indication that FEC recognition has any logical correlation to voter support in Florida. Second, the requirement that a minor political party submit a ballot access petition signed by one-percent of registered voters is unconstitutionally burdensome for the same reasons set forth by *Green Party of Georgia*, 171 F.Supp.3d 1340 (aff'd on appeal in *Green Party of Georgia*, 674 Fed. Appx. 974).

As further explained below, these burdens are either unconstitutionally burdensome in their own right, or are applied in violation of the equal protection clause. And the state's likely

justification that ballots must be stringently regulated to avoid voter confusion on the ballot proves a baseless reason for the regulation when from 2000 through 2008, the three presidential election ballots had no practical limit on ballot access other than organizing as a minor political party and associating with a national party, and the 2012 presidential election ballot allowed all minor political parties to nominate candidates by certification. The largest election ballot had fourteen partisan options between 2000 and 2012, and 2012 proved that the great state interest we need to protect against – a confusing and unwieldy ballot – was nothing more than a non-existent bogeyman. A list of eleven names is not confusing. Based on this actual experience, and the relative weakness of the state's interest to protect against an unwieldy ballot, the state should have to meet strict scrutiny in order to justify any regulation requiring anything in excess of a party chairman's certification.

## II. Judicial Review of Election Laws Requires Consideration of the Statutes in the Aggregate, and a Weighing of the Burdens Against the State Justifications, and Recognizing that Fundamental Rights Require Strict Scrutiny.

Political parties exist to advocate positions and philosophies and serve as a vehicle where like-minded people can assemble. "Under our

political system, a basic function of a political party is to select

candidates for public office to be offered to voters at elections." *Kusper v.*

*Pontikes*, 414 U.S. 51, 58 (1973).

> The right to form a party for the advancement of political
> goals means little if a party can be kept off the election ballot
> and thus denied an equal opportunity to win votes. So also,
> the right to vote is heavily burdened if that vote may be cast
> only for one of two parties at a time when other parties are
> clamoring for a place on the ballot.

*Williams v. Rhodes*, 393 U.S. 23, 31 (1968).

Thus, "'only a compelling state interest in the regulation of the subject

within the State's constitutional power to regulate can justify limiting

First Amendment freedoms.'" *Id.* (quoting *NAACP v. Button*, 371 U.S.

415, 438 (1963)).

Ballot access limiting statutes must be considered in the aggregate:

"The concept of 'totality' is applicable . . . in the sense that a number of

racially valid provisions of elections laws may operate in tandem to

produce impermissible barriers to constitutional rights." *Storer v.*

*Brown*, 415 U.S. 724, 737 (1974). "A court would want to examine the

*cumulative* burdens imposed by the *overall* scheme of electoral

regulations upon the rights of voters and parties to associate through

primary elections." *Clingman v. Beaver*, 544 U.S. 581, 607 (2005)

(O'Connor, *concurring*) (recognizing that the appellant failed to properly raise the issue) (emphasis in original).

A district court evaluates constitutional challenges to state election laws as the Supreme Court set out in *Anderson*, 460 U.S. 780:

> [A district court] must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights.

*Anderson*, 460 U.S. at 789.

"[A]s a general matter, 'before that right [to vote] can be restricted, the purpose of the restriction and the assertedly overriding interests served by it must meet close constitutional scrutiny.'" *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972) (internal citations omitted). This scrutiny "requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Citizens United*, 558 U.S. at 312 (internal quotations omitted). "Ordinarily, 'the strict scrutiny test is applicable under the Equal Protection Clause to classifications affecting the exercise of

fundamental rights.'" *Fulani v. Krivanek*, 973 F.2d 1539, 1542 (11th Cir. 1992) (quoting *American Booksellers v. Webb*, 919 F.2d 1493, 1499 (11th Cir. 1990)).

In testing the legitimacy of a State's asserted interest, a court is not required to accept at face value any justification the state may give for its practices. Rather, the court must determine the offered justification is real, and not merely a pretextual justification for its practices. *Reform Party of Allegheny County v. Allegheny Count Dep't of Elections*, 174 F.3d 305, 315 (3rd Cir. 1999).

Even an otherwise legitimate state concern cannot be accepted without evidence that the problem the state is asserting is real.

> The State has made no clear argument regarding the precise interests it feels are protected by the regulations at issue in the case, relying instead on generalized and hypothetical interests identified in other cases. Reliance on suppositions and speculative interests is not sufficient to justify a severe burden on First Amendment Rights.

*Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 593 (6th Cir. 2006).

Therefore, it is insufficient for the state to merely assert a defense; it must rather present evidence of a real problem that its ballot access limiting statutes seek to address. In addition to actually having a

17

legitimate reason for its practice, the state must also show that the statute actually addresses the problem. *Reform Party*, 174 F.3d at 315.

There are also limits on the State's interests when elections to federal office are involved: "The Framers understood the Elections Clause as a grant of authority to issue procedural regulations, and not as a source of power to dictate electoral outcomes, to favor or disfavor a class of candidates, or to evade important constitutional restraints." *United States Term Limits, Inc. v. Thornton*, 514 U.S. 779, 833 (1995).

Here, actual experience from 2000 through 2012 shows that almost unfettered access to the ballot by a minor party chairman's certification will not result in a confusing or unwieldly ballot. Furthermore, as outlined below, the criteria for access to the ballot, namely that the FEC recognized a national party as a national committee, has no logical correlation to the level of party support in the Florida electorate, and consequently, the statute fails to actually address the problem the state claims exists.

III. **The Florida Statutes Are Unconstitutionally Severe Burdens on First and Fourteenth Amendment Rights of Free Speech in the Arena of Political Discourse, Association by the Parties and their Members, and the Rights of the Parties' Members and Others to Vote for the Candidates of their Choice.**

Fla. Stat. § 103.021(4) is unconstitutional because the FEC's determination that a party constitutes a national committee fails to establish that a minor political party has any modicum of support under Florida law, and the alternative one-percent signature requirement is unconstitutional for the same reason articulated in *Green Party of Georgia v. Kemp*, 171 F.Supp.3d 1340 (N.D. Ga. 2016), and the fact that other minor political parties, some of whom may have a lesser modicum of support in Florida than the Plaintiffs are exempted because they had, at some point in their history, a sufficiently large enough party around the country to be considered a "national committee" by the FEC.

A. **Florida's Reliance on the FEC's Determination that a Party Constitutes a National Committee Does Not Further a Legitimate State Interest and is Unconstitutional.**

First, as to the requirement that a minor political party be associated with an organization recognized by the FEC as national committee implicates rights to free speech, association, and ballot access, the statute makes no logical sense when you consider the types

19

of organizations that have been accepted and rejected for national committee recognition by the FEC, and you compare them to organizations that have various levels of political support in the Florida. The burdens are severe because failing to convince the FEC that it deserves national committee status potentially bars the minor party from the ballot and in turn, completely expels the party and its members from that election cycle's political discourse.

The equal protection clause is implicated because minor political parties that have very little Florida voter support might be recognized by the FEC, and in other instances, the FEC might reject a party that has significant Florida support imposing on that party a significant burden of conducting a ballot access signature campaign. Richard Winger ("Winger") is an expert in ballot access laws and both independent candidates and minor political parties' participation in elections. (Winger Decl., ¶ 3.) Winger's curriculum vitae sets forth his extensive experience and expertise. (Winger Decl., ¶ 3, C.V. included with declaration.)

As fully set forth in Winger's declaration at paragraphs 15-41, there is no logical correlation of the FEC's decisions to grant or reject a

political party's application for national committee status. To date, only six parties besides the two big ones – Democrats and Republicans – have been granted national committee status, and those are: (1) Libertarian Party in 1975; (2) Socialist Party[3] in 1980; (3) Natural Law Party in 1992; (4) U.S. Taxpayers Party in 1995 (which subsequently changed its name to Constitution Party in 1999); (5) Reform Party in 1998; and (6) Green Party in 2001. *Id.*, ¶ 15.

In turn, nine parties have applied for national committee recognition and were denied: (1) Liberal Party of New York in 1976; (2) Pyramid Freedom Party in 1978; (3) Citizens Party in 1980; (4) National Unity Party in 1980; (5) Populist Party in 1988; (6) U.S. Taxpayers Party in 1992;[4] (7) Green Party in 1996;[5] (8) 1787 Party in 2013; and (9) United Party in 2016. *Id.* ¶ 16.

As such, there are only six minor parties that could possibly qualify for ballot access in Florida by virtue of their FEC national committee

---

[3] This Socialist Party is not associated with the Plaintiff in this case: The Party for Socialism and Liberation.

[4] The U.S. Taxpayers Party was subsequently granted national committee status two years later in 1994. (Winger Decl., ¶ 15.)

[5] The Green Party was subsequently granted national committee status five years later in 2001. (Winger Decl., ¶ 15.)

recognition. But only four of those parties are even organized as minor

political parties in Florida. *See*

https://dos.myflorida.com/elections/candidates-committees/political-

parties/ (last accessed on April 6, 2020). To become a minor political

party, you must merely follow the steps set forth in Fla. Stat. §

103.095(1). Analyzing Fla. § 103.095(1)-(3), a minor political party can

form with as few as three Florida residents and hence, if the Socialist

Party or National Law Party found three sympathetic Florida residents

to organize as an affiliated minor political party, they could obtain

immediate access to the 2020 Presidential ballot by mere certification

without establishing any other modicum of Florida electoral support.

Both Plaintiffs are well established in Florida, having been active in

Florida politics for several election cycles with many more than three

members. (Bach Decl., ¶ 7; Ellis Decl., ¶ 7.) Other than the most recent

presidential election in 2016, when the Secretary of State barred them

from placing their candidates on the ballot, these parties have both

place candidates on the ballot in 2008 and 2012.

There are also good reasons not to seek national committee

recognition because national committee recognition brings with it added

responsibilities to keep and file detailed federal campaign reports. (Winger Decl.,¶ 18.) A party may not believe that taking on that added administrative obligation is in their best interest, but that does not mean they can't have an impact in the election. Six parties have never asked for national committee status and yet polled over 50,000 votes nationwide. *Id.*

The FEC is also not considering particular states' interests when deciding to grant or deny national committee recognition. For example, the FEC tends to deny applications unless the party first places candidates on the ballot in several states and is organized across the nation. *Id.* ¶¶ 20-21. This requirement harms the Independent Party in particular because, true to its name, it desires to be Independent from any national organization. (Bach Decl., ¶ 8.) Rather, the Independent Party remains free to associate with any candidate they choose in each election cycle. *Id.*

This is not an uncommon or ineffective approach to exercising their rights to participate in a political election. Howie Hawkins was nominated to be the Socialist Party USA candidate for President, but is also seeking the nomination of the Green Party.

https://howiehawkins.us/howie-hawkins-wins-socialist-party-usa-nomination-green-candidate-seeks-to-build-left-unity-with-multiple-nominations/ (last accessed on March 25, 2020). Howie Hawkins' website also indicates that he is seeking the nomination of several "state-level independent progressive parties." *Id*. These include the Peace and Freedom Party of California, the Progressive Party of Oregon, the Citizens and Labor parties of South Carolina, and the Liberty Union and Progressive parties of Vermont. *Id*. As the Supreme Court has said:

> This First Amendment freedom to gather in association for the purpose of advancing shared beliefs is protected by the Fourteenth Amendment from infringement by any State. . . . And the freedom to associate for the common advancement of political beliefs, . . . necessarily presupposes the freedom to identify the people who constitute the association, and to limit the association to those people only.

*Democratic Party*, 450 U.S. at 121-22 (internal quotations and citations omitted) (upholding the right of the Democratic National Committee to bar Wisconsin delegates from participation in the national convention if the Wisconsin open primary election violates the National Committee's convention rules). Here, the Independent Party and its members like to retain the control of who they nominate as a candidate for president in

the state party, and are not necessarily interested in submitting that control to a national convention. (Bach Decl., ¶ 8.)

The Independent Party's approach to these elections is a legitimate exercise of its constitutional right of association, and imposing ballot access requirements that would require them to abandon that approach is severely burdensome. Indeed, Winger has charted the number of states that were organized in a single state and also nominated a candidate for office. (Winger Decl., ¶ 43, Ex. D.) Several names on the chart pop off the page as well-known household names and very influential in elections over the last 25 years or so, including Donald Trump (who actually won the Presidency appearing as the nominee for the American Independent Party of California), Ralph Nader, Ross Perot and others. *Id*.

Finally, the FEC does not consider the modicum of support nationwide or in any states to determine national committee eligibility making this requirement an extremely weak proxy to show a modicum of support in Florida. The Libertarian Party polled only 3,673 votes in the entire nation in 1972, but was granted national committee status in 1975. (Wegner Decl., ¶ 23.) Then in 1980, the Socialist Party polled

6,898 votes nationwide and was granted national committee status in December 1980, but then the FEC rejected the Citizens Party application despite polling 234,294 nationwide in 1980. *Id.*, ¶ 24.

In 1988, the New Alliance Party polled 217,219 in the nationwide presidential election, but was denied national committee status, but the Socialist Party, which continued to be recognized only polled 3,882 nationwide votes. *Id.*, ¶¶ 25-26. And the examples continue in Winger's declaration at ¶¶ 27-41, all of which are important for the Court to review. What these examples make clear is that there is absolutely no correlation to Florida electorate support established by FEC national committee recognition.

If a modicum of voter support is not a factor in the FEC's national committee status determinations, the question has to be asked: what is the logic behind Florida using a 1% voter signature requirement *as an alternative* ballot access avenue if a minor political party is not an FEC recognized national committee? The answer is obvious, there is no logical basis. The entire construct makes no sense and cannot be explained, and it is the particular state's statutory schema that must be

analyzed in context to determine whether it passes constitutional

muster. *Jenness v. Fortson*, 403 U.S. 431, 438 (1971).

Florida's current statutory construct does not hold up to the

Supreme Court's constitutional test set forth in *Anderson* and the

Plaintiffs' equal protection and other First Amendment rights are

violated by the unequal treatment and imposing burden placed upon

them to gain ballot access.

**B.   The One Percent Signature Requirement is
Unconstitutional Pursuant to Controlling Eleventh
Circuit Law**.

The requirement that any local party is required to obtain

signatures from one percent of the registered voters in the state is

unconstitutional under the *Anderson v. Celebrezze* for the reasons

articulated in *Green Party of Georgia v. Kemp*, 171 F.Supp.3d 1340

(N.D. Ga. 2016). Both Plaintiffs are severely burdened by the one-

percent requirement because they would both require the use of paid

professional circulators to meet the deadline and the cost would

unpredictable and prohibitive to both parties.

According to the Florida Department of State's website the last

general election was in 2018 and there were a total of 13,396,622

registered voters in Florida. *See*

https://dos.myflorida.com/elections/data-statistics/voter-registration-statistics/voter-registration-reportsxlsx/voter-registration-by-party-affiliation/ (last accessed on April 6, 2020). The one-percent signature requirement would require the Plaintiffs to obtain 133,966 valid signatures, a task that would require a massive financial and time commitment that other minor parties are not required to achieve, even some that poll at much lower levels than the Plaintiffs.

The costs prohibitions would operate as a bar to the ballot to these Plaintiff parties. There is no way they could come close to paying the $1-3 necessary to obtain the over 150,000 signatures necessary to get on the ballot and the $15,000-$20,000 necessary to pay to the county supervisors that have to review the signature petitions as required by Fla. Stat. § 97.097(4). (Bach Decl., ¶ 9; Ellis Decl., ¶ 8.)

In *Green Party of Georgia*, the Court faced a challenge to a one-percent signature requirement that applied to all minor political parties seeking to nominate a presidential candidate (unless the minor party also obtained at least one-percent of the vote in the previous election). In other words, a party could nominate a presidential candidate if the

party either met a performance standard or a petition standard. The
Florida statutory schema is actually more complicated because several
minor political parties avoid the signature requirement entirely, not
because they performed in the last election, but rather because they are
associated with a party that, at some point in that party's history, was
recognized by the FEC as a national committee. Those parties don't
have to show *any* substantial support in Florida by either obtaining a
certain signature percentage of registered voters or performing to a
certain level in the prior election cycle. And this of course weighs
heavily in favor of the Plaintiffs' claims that their rights are severely
burdened by a law that is not designed to meet a legitimate state
concern.

Nonetheless, the *Green Party of Georgia* district court's analysis
also applies here. The case applied the constitutional standard set forth
in *Anderson* articulated above. The court rejected the state's argument
that the one percent signature requirement was a modest requirement
that supported a legitimate state interest of avoiding voter confusion.
*Green Party of Georgia*, 171 F.Supp.3d at 1359 and 1365. The district
court pointed to the fact that in this particular case, Georgia's 50,000+

29

signature requirement wasn't narrowly tailored to further a state interest. *Id.* at 1365. "Georgia offer[ed] no evidence of voter confusion. And Justice Harlan, concurring in *Williams v. Rhodes*, opined that 'the presence of eight candidacies cannot be said, in light of experience, to carry a significant danger of voter confusion.'" *Id.* at 1365-66 (quoting *Williams v. Rhodes*, 393 U.S. 23, 47 (1968). That is similar to what we've had here. For four presidential election cycles from 2000 through 2012, Florida allowed all minor political parties to nominate their candidates by certification, and the Plaintiffs know of no reports of widespread voter confusion even though at least one ballot had fourteen partisan candidates listed. And although Justice Harlan held that eight candidacies cannot be said to be confusing, the Plaintiffs assert that a list of fourteen is still in that same non-confusing arena.

Here, we have Florida statute that allows minor political parties two avenues to nominate presidential candidates: one that allows a party to certify a candidate without establishing any modicum of support in Florida, and one that requires an enormous commitment in terms of both human time and financial resources, and one that most minor parties probably could not meet if required to do so. Under these

circumstances, the Supreme Court's case of *Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173 (1979) seems most apt.

In *Socialist Workers Party*, Illinois had a signature requirement for ballot access in a statewide election that required a fixed 25,000 signatures. *Id*. at 175. In a local election, the signature requirement was 5% of the number of persons who voted in the last election. *Id*. at 176. As the City of Chicago population grew, it ended up that political parties that wanted access to the Chicago ballot had to obtain 63,373 valid signatures. *Id*. at 177. Therefore, a new political party could gain ballot access in a race for governor by submitting 25,000 signatures from residents in the entire state, but to get on the ballot in Chicago, the party had to submit 63,373 signatures from a smaller geographic area.

The Supreme Court applied the equal protection clause and struck down the 5% signature requirement because when you considered the statutory schema together, they could not be reconciled. Here in Florida, we have the same situation. The one-percent signature requirement cannot be reconciled with statute that allows another

party access for what really amounts to significant support *outside* of Florida. If a party is popular outside of Florida, then they become effectively exempt from showing any modicum of support in Florida before presenting their candidates to the voters on a general election ballot. For this reason, the one-percent signature requirement is due to be deemed unconstitutional.

Finally, no minor or new political party or independent candidate has ever achieved ballot access with a signature requirement as high as the one effective in Florida under Fla. Stat. § 103.021(4)(b) except once in California. Winger prepared a chart for his newsletter *Ballot Access News* in 2009 outlining the highest petition requirement met by a candidate. The chart is attached as Exhibit C. (Winger Decl., ¶ 42, Ex. C.) This chart makes clear that it's not necessarily just a high *percentage* of the electorate that can provide an effective unconstitutional bar to the ballot, but also the size of the signature campaign itself is an effective bar. This Court should grant this motion for preliminary injunction and allow all minor political parties to nominate their candidates by certification to the Secretary of State by September 1, 2020.

**IV. Florida Should be Preliminarily Enjoined from Enforcing Fla. Stat. § 103.021(4) and Allow All Minor Political Parties to Nominate Their Presidential Candidates by Certification to Avoid an Irreparable Injury Because the Plaintiffs are Likely to Prevail on the Merits, the Damages to the State are Slight if they Exist at All, and the Injunction Would Not be Adverse to Public Interest.**

As articulated above, the standards to obtain a preliminary injunction require a showing by the movant that they have a substantial likelihood of success on the merits, that they will suffer an irreparable injury without the injunction, that the threatened injury outweighs the damages the injunction might cause to the opposing party, and the injunction would not be adverse to the public interest. *Callahan*, 939 F.3d at 1257.

Here, Florida's reliance on the FEC national committee determination has no logical correlation to showing any modicum of electoral support in Florida and as such, requiring the Plaintiffs to prove that support by conducting an extremely expensive and time-consuming signature campaign violates the Plaintiffs' rights under the Equal Protection Clause. And the one-percent signature requirement is also unconstitutional under the analysis provide by *Green Party of Georgia* and the Supreme Court's *Socialist Workers Party* cases.

Because the Florida statutes are not narrowly tailored to further a legitimate state interest, the Independent Party and Party for Socialism are substantially likely to prevail on the merits.

The Independent Party and Party for Socialism are also set to suffer an irreparable injury if they are barred from nominating a candidate to the 2020 ballot. The 2020 ballot will occur in November and once that date passes, there is no remedy at law, including monetary damages, that could cure the harm. These two parties already suffered a similar fate in 2016 when they were advised at the very last minute that their nominations were rejected.

The injury to the plaintiffs is also great while the potential harm the state might suffer if the injunction is granted is near nil. There is no significant additional cost by adding two names to the presidential ballot because the ballots will have to be printed or organized after all of the other minor political parties nominate their candidates by certification by September 1, 2020.

And finally, the injunction would serve no harm to the public. Rather, the public might be served if they were provided two additional options at the ballot box, and the public will also have the opportunity

34

to hear from the nominated candidates during the campaign talk about the issues that are important to them.

For the foregoing reasons, the Plaintiffs respectfully request the Court grant the motion for preliminary injunction barring enforcement of the challenged provisions of Fla. Stat. § 103.021(4) and allow the Plaintiffs to nominate their Presidential and Vice Presidential candidates to the Florida November general election ballot by certification as other minor political parties in Florida are allowed to do.

Dated this 6th day of April, 2020.

Respectfully submitted,

**THE BERNHOFT LAW FIRM, S.C.**
Attorneys for Plaintiffs


By: /s/ Daniel J. Treuden
Daniel J. Treuden
Admitted *pro hac vice*

1402 E. Cesar Chavez Street
Austin, Texas 78702
telephone: (512) 582-2100
facsimile:  (512) 373-3159
djtreuden@bernhoftlaw.com

## **CERTIFICATE OF SERVICE**

The foregoing document was served on the Defendant by the ECF

system at the time of filing:

ashley.davis@dos.myflorida.com
Deputy General Counsel Ashley E. Davis

Attorney for:
Laurel M. Lee, Florida Secretary of State
R.A. Gray Building
500 S. Bronough Street
Tallahassee, Florida 32399


Signed this 6th of April, 2020.



 /s/ Daniel J. Treuden
Daniel J. Treuden

36