**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

| | |
|---|---|
| INDEPENDENT PARTY OF FLORIDA and PARTY FOR SOCIALISM AND LIBERATION, )<br><br>Plaintiffs,<br><br>v.<br><br>LAUREL M. LEE, Florida Secretary of State, in her official capacity,<br><br>Defendant. | Case No. <u>4:20-cv-00110-MW-CAS</u> |

## <u>DECLARATION OF RICHARD WINGER</u>

I, Richard Winger, hereby declare that:

1. My name is Richard Winger. I make this declaration based on my own personal knowledge. I am competent to testify to the matters stated herein.

2. I  reside at 3201 Baker Street, San Francisco, California 94123.

3. I graduated from the University of California at Berkeley in 1966 with a BA degree in political science. Since 1985, I have published a newsletter, *Ballot Access News (*12 issues per year), which covers legal,

legislative and political developments of interest to third parties and independent candidates. I have read the ballot access laws (for minor parties and independent candidates) of each state, for all years starting in 1888, the year government-printed ballots began in the United States. I have also obtained election returns for all states for all federal office, and all statewide offices, since that year, and I have calculated the number of signatures needed on petitions for minor party ballot access in each state, for all years since 1888. I have copies of all of the Federal Election Commission rulings on whether a particular party qualifies as a "national committee." My *c.v.* is attached.

History of Recent Changes in Florida's Ballot
Access Laws for Minor Party Presidential Nominees

4. Between 1949 and 1999, Florida had easier procedures for a minor or new political party to get on the ballot for President, than for statewide office. In 1949 the legislature passed a bill saying a party that was not already ballot-qualified needed 7,500 signatures to get its presidential nominee on the ballot. 1949 Session Laws, chapter 25051, p. 122. By contrast, minor party candidates could not get on the ballot for any other partisan office unless they had registration membership of at least 5% of the state registration total. No party in Florida, other

2

than the Republican or Democratic Parties, ever had registration as high as 5% of the state total.

5. In 1967, the presidential minor party petition was increased to three-fourths of 1%, which was in effect in 1968, and which required 18,479 signatures. George Wallace, running under the label "George Wallace Party", is the only presidential candidate who submitted this petition.

6. In 1970, the presidential minor party petition was increased to 1% of the number of registered voters, which for 1972 was 27,970 signatures. No one completed this petition in 1972.

7. Also in 1970, the law on how a party appears on the ballot for office other than president was declared unconstitutionally difficult by the Florida Supreme Court. *Beller v Adams*, 235 So.2d 502. The legislature immediately replaced it with a petition of 3% of the number of registered voters, although if a party merely wanted to be on for President, the 1% petition remained in place.

8. In 1976, the Fifth Circuit ruled that Florida was violating the Constitution by having no procedure for an independent presidential candidate to get on the ballot. *McCarthy v Askew,* 540 F.2d 1254. In

1977, the legislature created a 1% petition procedure for such candidates, identical to the minor party presidential petition procedure.

9. In 1998 the voters passed Revision Eleven to the State Constitution, which said that for ballot access, all candidates should be treated equally. In response, in 1999, the legislature passed SB 754 unanimously, which is at ch. 99-318, at page 3400, Laws of Florida. It said that a new or minor party could be a qualified party if it filed a list of its officers, a copy of its bylaws, and agreed to report information about its finances on a regular basis. Once it was a qualified party, it could place its presidential nominee on the ballot if it was affiliated with a "national" political party that held a national presidential convention. Also, the state party was required to submit a complete list of presidential elector candidates who were registered members of that party. In 2000, the minor parties which placed their presidential nominee on the Florida ballot were:  Green, Reform, Libertarian, Natural Law, Workers World, Constitution, Socialist, and Socialist Workers. None of them needed a petition. The new law also provided that a qualified Florida party that was not a state affiliate of a

"national" party could also place its presidential nominee on the ballot if it submitted a petition of 1% of the registered voters.

10. In 2004, the Reform Party, which was still a ballot-qualified party in Florida, nominated Ralph Nader for president. Various individuals sued the Secretary of State, arguing that the Reform Party was not a bona fide party and should not be recognized. The State Supreme Court ruled that the Reform Party was a bona fide party in *Reform Party of Florida v Black,* 885 So.2d 303. The Florida Supreme Court noted that the Federal Election Commission recognized the Reform Party as a national committee, although it noted, on page 313, "We cannot conclude that the Legislature intended to incorporate the FEC definition within the use of the term 'national party'. This is especially so because the FEC's interest relates to the integrity of campaign fund-raising access, whereas the state's interest lies in protecting the integrity of the ballot."

11. In 2005, the legislature passed HB 1567, which defined "national" party as a party that is on the ballot in at least one other state besides Florida.

12. In 2011, the legislature passed HB 1355, which, among many other provisions on unrelated election law subjects, changed the definition of "national" party in sec. 103.021(4)(a). The bill deleted the definition that said a "national" party was a party that was on the ballot in at least two states, and instead said it is a party that is "registered with and recognized as a qualified national committee of a political party by the Federal Election Commission."

13. On September 1, 2011, the General Counsel to the Secretary of State, Daniel E. Nordby, wrote a letter to a representative of Americans Elect, which was a newly-qualifying party in Florida and around the United States. The letter said that the Secretary of State has no official knowledge of which parties are recognized by the Federal Election Committee as national committees, and therefore the Secretary of State would accept a presidential nominee for Americans Elect, whether it was recognized by the FEC as a national committee or not, because it was not the duty of the Secretary of State to look beyond the paperwork filed by Americans Elect, and that paperwork did not make any reference to the FEC. In mid-2012, Americans Elect decided not to run anyone for president that year, and dissolved its party status in Florida

and most other states. But because of the September 1, 2011 letter, the Secretary of State did print the presidential nominees of the Peace & Freedom, Objectivist, Justice, American Independent, and Socialism and Liberation Parties on the November 2012 ballot, even though they did not petition and they were not recognized by the FEC. The total number of presidential candidates on the November 2012 ballot was twelve candidates. A copy of the letter is attached as Exhibit A.

14. In early September 2016, the Secretary of State informed the Independent Party, the Party for Socialism and Liberation, and the America's Party, that their presidential nominees would not be listed on the November 2016 ballot, even though all three parties were recognized by the state, and all had presented slates of presidential elector candidates who were registered members of the party. The basis for the decision denying ballot access to these parties' presidential nominees was that the three parties are not recognized by the FEC. The denial letters of September 2016 did not reveal how the Secretary of State became aware of the status of these parties with the FEC, nor did it mention the September 1, 2011 letter that had said the FEC requirement could not be enforced. The Secretary's denial of ballot

access came so late in the season, it was impossible for any of the three parties to sue. A copy of the letter to the Independent Party, dated September 7, 2016, is attached as Exhibit B.

<u>The FEC Does Not Measure Voter Support for a Party</u>

15. The Federal Election Commission has been issuing advisory opinions on whether various political parties may qualify as "National Committees" ever since 1975. The Commission has issued fifteen advisory opinions on whether particular minor parties qualify for "National Committee" status. Six opinions grant "National Committee" status to the applicant. They are: 1975-129 (Libertarian Party); 1980-121 (Socialist Party); 1992-30 (Natural Law Party); 1995-16 (U.S. Taxpayers Party, which in 1999 changed its name to Constitution Party); 1998-2 (Reform Party); 2001-13 (Green Party). Of course, the Democratic and Republican Parties also qualify for National Committee status. This is considered so obvious, the FEC has never bothered to issue advisory opinions on whether they qualify.

16. The nine advisory opinions which deny "National Committee" status to an applicant are: 1976-95 (Liberal Party of New York); 1978-58 (Pyramid Freedom Party); 1980-3 (Citizens Party); 1980-131

(National Unity Party); 1988-45 (Populist Party); 1992-44 (U.S. Taxpayers Party); 1996-35 (Green Party); 2013-01 (1787 Party); 2016-07 (United Party).

17. Once the FEC has granted national committee status to a political party, there is no mechanism for that party to lose its status as a national committee. Therefore, to this day, the six minor parties that were once granted national committee status continue to enjoy that status.

18. The federal law that defines "national committee" is in 52 U.S. Code sec. 30101(14): "the organization which, by virtue of the bylaws of a political party, is responsible for the day-to-day operation of such political party at the national level, as determined by the Commission." Although all political parties have a body that controls the activity of that party, many minor parties (since the FEC has existed) have chosen not to apply for FEC recognition as a national committee. The only advantage to being so recognized (other than ballot access in Florida) is that a "national committee" can receive higher contributions from individuals than other types of campaign committees. Disadvantages include an obligation to file detailed federal campaign reports.

Significant minor parties that have participated in presidential elections during the lifetime of the FEC, but which never asked for national committee status, are the American Party, the American Independent Party, the Communist Party, the New Alliance Party, the Party for Socialism and Liberation, and the Socialist Workers Party. All of these parties ran presidential nominees during the lifetime of the FEC that polled in excess of 50,000 votes. Of course, these parties filed campaign finance reports with the FEC, but under the auspices of the presidential candidate's campaign committee.

19. Because the federal definition of "national committee" is vague, the FEC has had to interpret the law. From the fifteen Advisory Opinions issued by the FEC on this subject, it is possible to observe these principles: (1) a party cannot gain national committee status until <u>after</u> it has placed candidates for president and congress on the ballot, under the party label, in several states; (2) a party cannot gain national committee status unless it is organized throughout the United States; (3) the party's ability to draw a large vote for its candidates is irrelevant to whether it may receive national committee status.

20. The conclusion that the FEC will not grant national committee status to a party until after it has placed candidates for president and congress on the ballot in several states is based on these advisory opinions: 1980-3 (Citizens Party denied); 1988-45 (Populist Party denied); 1992-44 (U.S. Taxpayer Party denied).

21. The conclusion that the FEC will not grant national committee status to a party unless it is organized across the United States is based on advisory opinions 1976-95 (Liberal Party denied); 1980-131 (National Unity Party denied); and 2016-07 (United Party denied).

22. The conclusion that the FEC does not base its conclusion on whether the party has a modicum of voter support for President is based on these observations about various presidential elections 1972 through 2016, as follows:

<u>1972 Presidential Election</u>

23. The FEC did not exist until 1974, but it took note of the 1972 presidential election when it granted national committee status to the Libertarian Party in 1975. The Libertarian Party had only polled 3,673 votes for President in the nation in 1972, placing ninth. But that was no impediment to the FEC's granting it national committee status.

## 1980 Presidential Election

24. The FEC granted national committee status to the Socialist Party in December 1980, even though it had only polled 6,898 votes in the entire nation in 1980 for its presidential nominee, David McReynolds. McReynolds placed thirteenth, far behind Barry Commoner of the Citizens Party, who had polled 234,294 votes in the same election. Yet the FEC had denied national committee status to the Citizens Party earlier in 1980.

## 1988 Presidential Election

25. The New Alliance Party placed fourth in the presidential election, with 217,219 votes cast for its presidential nominee, Lenora Fulani. But the New Alliance Party did not have national committee status at the time, and never requested national committee status. The party had been formed as a party for New York in 1979. It organized nationally in 1983, and ran its first presidential candidate in 1984. The party never wished to have national committee status because it didn't think any individual desired to give the party as much as $25,000 for any of its federal campaign, and because it felt that having to file FEC financial reports would be burdensome. Fulani herself qualified for

primary season matching funds in 1988. Such funds are available for presidential candidates seeking the nomination of any political party, whether that party was recognized as a national committee or not. A candidate seeking the presidential nomination of a party must raise $5,000 from each of 20 states, in order to qualify for the funds.

26. Yet the Socialist Party had national committee status in 1988, and if the existing Florida ballot access law had been in effect in 1988, the Socialist Party could have qualified for automatic ballot status for its presidential nominee in Florida. Its presidential nominee in 1988, Willa Kenoyer, only received 3,882 votes in the entire nation.

## 1992 Presidential Election

27. The Populist Party placed fifth in the presidential election, with 107,014 votes cast for its presidential nominee, James "Bo" Gritz. But the Populist Party did not have national committee status at the time; its application for national committee status had been denied in 1988.

28. Yet the Socialist Party did have national committee status in 1992, and if the existing Florida ballot access law had been in effect in 1992, it would have been entitled to automatic ballot status for its

presidential nominee, J. Quinn Brisben, who only received 3,057 votes in the entire nation.

1996 Presidential Election

29. The Reform Party placed third in the presidential election, with 8,085,402 votes cast for its presidential nominee, Ross Perot. But the Reform Party did not have national committee status at the time, and could not have received national committee status in time to qualify for automatic inclusion on the Florida general election ballot for president in 1996, because it was a new party that, before late 1995, had not even been in existence, and therefore had no record of placing candidates on the ballot for federal office.

30. The Green Party placed fourth in the presidential election, with 685,040 votes cast for its presidential nominee, Ralph Nader. But the Green Party did not have national committee status at the time, nor could it have received national committee status in time to place Nader on the Florida ballot without a petition, because it, like the Reform Party, had never before 1996 had a presidential nominee.

31. Yet the Socialist Party did have national committee status, so (if it had been a qualified party in Florida in 1996), it could have placed its

presidential nominee on the Florida ballot with no petition, even though its presidential nominee, Mary Cal Hollis, only received 4,706 votes in the entire United States, placing thirteenth.

2000 Presidential Election

32. The Green Party placed third in the presidential election, with 2,882,738 votes cast for its presidential nominee, Ralph Nader. But the Green Party did not have national committee status at the time, and could not have received national committee status in time to qualify for automatic inclusion on the Florida general election ballot for president in 2000, because it had been denied that status by the FEC immediately after the 1996 election, in advisory opinion 1996-35. That opinion said that because Ralph Nader in 1996 had not spent or raised as much as $5,000, he was not a "candidate" as defined by federal campaign law, and therefore it was still true in 2000, before the election, that the party had not yet had a presidential candidate.

33. Yet the Socialist Party did appear automatically on the Florida ballot for president in 2000, even though its 2000 presidential nominee, David McReynolds, only received 5,602 votes in the entire nation, placing tenth. Even if the existing Florida ballot access law had been in

effect in 2000, McReynolds would have been on the Florida ballot, because his party had national committee status.

### 2008 Presidential Election

34. The Florida ballot-qualified party, the Ecology Party, did appear on the Florida ballot for President in 2008. Its presidential nominee, Ralph Nader, placed third in the election both in Florida and in the nation. Nader received 739,034 votes in the nation. But if current Florida law had been in effect in 2008, the Ecology Party could not have appeared on the ballot automatically for President because it was a new party that had never existed before the 2008 election.

35. Yet the Socialist Party did appear on the Florida ballot, and it could also have been on in 2008 under the existing ballot access law, because it was recognized by the FEC as a national committee. In 2008, its nominee, Brian Moore, received 6,538 votes in the entire nation, placing tenth.

36. Also, the Reform Party was ballot-qualified in Florida and in 2008, it was a national committee, yet its presidential nominee, Ted Weill, only received 481 votes in the entire nation that year. Under the

existing ballot access law, Weill was also eligible to be on the Florida

ballot automatically.

## 2012 Presidential Election

37. The Florida ballot-qualified party, the Peace & Freedom Party,

did appear on the Florida ballot for President in 2012. Its presidential

nominee, Roseanne Barr, placed sixth in the election in the nation, and

fifth in Florida. Barr received 67,037 votes in the nation.  But if current

Florida law had been in effect in 2012, the Peace & Freedom Party

could not have appeared on the ballot automatically for President

because it was a new party that had never existed before the 2008

election as a national party (although it had existed in California as a

one-state party since 1968).

38. Yet the Socialist Party, which in 2012 placed fifteenth in the

nation and eleventh in Florida for president, would have qualified for

automatic ballot status for president in 2012 because it was a national

committee. Its presidential nominee, Stewart Alexander, received 4,051

votes in the nation.

## 2016 Presidential Election

39. The Florida ballot-qualified party, the Independent Party, nominated Evan McMullin as its presidential nominee in 2016. McMullin was an independent candidate in some states; he was also the nominee of various minor parties in certain other states (he was the Independence Party nominee in Minnesota and South Carolina, and the Better for American Party nominee in New Mexico). Even though he was only on the ballot in eleven states, he received 731,733 votes in the nation, placing fifth. He was unable to appear on the Florida ballot automatically because of the new law. The Independent Party of Florida could never have qualified for national committee status, even if it had requested it, because it is not nationally-organized. It is not affiliated with any parties outside Florida.

40. Also in 2016, the ballot-qualified Party for Socialism and Liberation was unable to place its presidential nominee, Gloria La Riva, on the Florida ballot, because of the new law. She received 74,392 votes in the nation, placing seventh. Her party is currently ballot-qualified in Florida, but because it does not have national committee status, the party cannot qualify in 2020 for automatic placement of its presidential nominee on the ballot.

41. By contrast, in 2016, Florida permitted the Reform Party presidential nominee, Rocky De La Fuente, to be on the ballot, even though he polled 33,136 votes nationally, placing eighth. And if the Socialist Party had been ballot-qualified in Florida in 2016, it would also have been able to place its presidential nominee on the ballot automatically, even though its nominee, Emidio Soltysik, only received 2,693 votes in the entire nation, placing 22nd.

The Alternate 1% Presidential Petition

42. If a ballot-qualified Florida is not recognized by the FEC as a national committee, the law permits it to place its presidential nominee on the November ballot if it submits a petition signed by 1% of the number of registered voters as of October of the preceding election, which is 132,781 signatures. This number represents a very severe petition requirement for a minor party. Except in California, no ballot access petition for a minor or new party, or an independent candidate for any office, has ever overcome a petition requirement that high. The December 1, 2009 issue of *Ballot Access News* has a chart, "What is the Highest Petition Requirement Ever Met by a Candidate?". It is attached as Exhibit C.  In 2016, a U.S. District Court in Georgia invalidated

Georgia's requirement that the presidential nominee of an unqualified party, or an independent presidential candidate, must submit a petition of 49,336 signatures. In 2017 the Eleventh Circuit affirmed that decision.

Presidential Candidates Running for
State Parties Organized in a Single State

43. As noted in ¶ 9 above, in 1999, the Florida legislature passed SB 754 to implement Revision Eleven. The bill said that "national" parties could be on for president automatically, but if those Florida ballot-qualified parties weren't "national", they could not be on the general election ballot for president without a very difficult petition drive. Probably the authors of the bill limited presidential ballot access to "national" parties because they assumed that if a party is only ballot-qualified in Florida, it doesn't even make sense for it to have a presidential nominee.

44. But if the authors had been more familiar with the history of minor parties, and especially minor parties that have been organized in only a single state, they would have realized that one-state parties have played a very important role in U.S. presidential elections. Some of the most important presidential candidates in history have depended on

being nominated by one-state parties. *See* Exhibit D, which is a chart I am publishing in the April 2020 issue of *Ballot Access News*, which gives instances in the past when parties only organized in a single state still nominated presidential candidates who had strong national campaigns.

45. The leading example is that Hubert Humphrey in 1968, the Democratic Party's nominee for president, could not have been on the ballot in Alabama if it had not been for a one-state party in that state, the National Democratic Party of Alabama. Despite its name, the "National Democratic Party of Alabama" (which is how it appeared on Alabama ballots during its lifetime, 1966-1982) was not affiliated with the national Democratic Party. It was primarily composed of leaders of the African-American community who opposed the Democratic Party of Alabama because the Democratic Party of Alabama was controlled by opponents of integration. In 1968, the Alabama Democratic Party nominated George Wallace for president, even though the national convention of the Democratic Party in August had nominated Hubert Humphrey. State parties have the authority to select their own presidential nominees; national presidential conventions are not

binding on state parties. At the time, Alabama had a May deadline for an independent presidential candidate to get on the ballot. Fortunately for Humphrey, the already-existing "National Democratic Party of Alabama" nominated him. Otherwise Alabama voters could not have voted for Humphrey without casting a write-in vote.

46. Other important presidential candidates who made use of their nomination by one-state parties include Ross Perot, Ralph Nader, Thomas Dewey, Franklin D. Roosevelt, George Wallace, Robert La Follette, and Evan McMullin in the 2016 election.

47. And even when one-state parties have nominated presidential candidates who were not on the ballot in other states, those efforts were still sometimes significant. The Texas Regulars Party of 1944 ran unpledged electors, and sincerely believed that they could win the presidential election in Texas in 1944. Most observers thought there was a chance that the Texas Regulars slate could have won. The Texas Regulars hoped to win in Texas, and if neither Thomas Dewey nor Franklin Roosevelt got a majority in the electoral college, they hoped they could use their electoral votes to bargain with both Dewey and Roosevelt for policies they favored. The story of the Texas Regulars

Party is described in detail in a book published in 2019 called "The Lowest Ebb", authored by Darcy Richardson, in Chapter 22.

48. To summarize, one-state parties have often played an important role in presidential elections, and there appears to be no state interest in treating them different than ballot-qualified parties which are nationally-organized.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury the foregoing is true and correct to the best of my information, knowledge and belief.

Dated: March 30, 2020.

Richard Winger